911 So.2d 206 (2005)
LAKE ROSA and Lake Swan Coalition, Inc., et al., Appellants/Cross-Appellees,
v.
BOARD OF COUNTY COMMISSIONERS, etc., et al., Appellees/Cross-Appellants.
No. 5D04-2559.
District Court of Appeal of Florida, Fifth District.
September 23, 2005.
C. Allen Watts of Cobb & Cole, DeLand, for Appellants/Cross-Appellees.
Russell D. Castleberry, Palatka, for Appellee/Cross-Appellant Board of Commissioners of Putnam County, Florida.
William L. Townsend, Jr. of Walton & Townsend, P.A., Palatka, for Appellee/Cross-Appellant *207 Southeastern District of the Christian and Missionary Alliance.
SAWAYA, J.
Lake Rosa and Lake Swan Coalition, Inc. and intervening plaintiff John King (collectively the Coalition) appeal the final order rendered in their suit for injunctive and declaratory relief under section 163.3215, Florida Statutes, challenging the issuance of a building permit as being inconsistent with the Putnam County Comprehensive Plan (the Comprehensive Plan). The defendants in the underlying action are the Board of County Commissioners of Putnam County (County) and an intervening defendant, the Southeast District of the Christian and Missionary Alliance (Alliance). The general issue we must resolve is whether the trial court properly applied the Agricultural II classification under the Comprehensive Plan when determining whether the building permit applied for by the Alliance should have been issued. Stating this issue is much easier than resolving it, given the many complicating factors that we must consider in our search for the correct legal answer. Our search begins with the facts.
The Alliance owns property known as Lake Swan Camp, and it is here that the dispute between the parties began. The camp is a recreational facility situated between Lake Rosa and Lake Swan, which is a location it has enjoyed since the 1920's. The purpose of the camp facilities, as stated in its mission statement, is "to enrich the Church of Jesus Christ by providing Christ-centered programming and quality facilities for all age groups." The facilities consist of a motel, lodge, chapel, conference center, dining hall, kitchen, dormitories, cottages, and other recreational amenities that allow for sporting events. The camp property includes approximately fifteen percent of the shoreline of Lake Rosa, which is a rather small lake of approximately eighty acres. Nestled along the shores of Lake Rosa are some thirty-eight homes whose inhabitants witness the almost daily and nonstop use of the lake by camp residents operating power boats and jet skis.
To further its mission and increase its revenues from the rental of these facilities to the public, the Alliance decided to expand its camp facilities. According to its master plan, it intended to construct numerous dormitory facilities, a human foosball court, gymnasium/auditorium, health club with swimming pool, a new administration building, tennis courts, RV parking facilities, convention center, and a sewage treatment plant. Phase one of this plan, which called for construction of a dormitory facility housing eighty youth campers, spawned the underlying litigation. Fearing increased use of an already overburdened lake by an even greater camp populace, homeowners whose property borders on Lake Rosa formed the Coalition to resist and prevent the planned expansion.
Just as the Alliance's master plan was to be implemented in phases, so too was the opposition to that plan by the Coalition. We note parenthetically that as the opposition efforts progressed, certain dates became significant and are presented by the parties to support their opposing positions, and so we will dwell on them.
Phase one began in September 2000, when the Coalition sought to prevent issuance of the building permit on the grounds that the new construction would violate certain zoning ordinances. As the zoning contest wound its way to an unsuccessful conclusionfor the Coalition that isphase two began on May 6, 2002, when the Coalition took the initial steps to file suit under section 163.3215, Florida Statutes (2001), by filing a verified complaint with the County. The County responded on *208 May 28 that it would not grant the relief requested in the complaint. Compliance with these conditions precedent set the stage for the Coalition, on June 5, 2002, to file the section 163.3215 complaint in the circuit court seeking a determination that the building permit was inconsistent with the Comprehensive Plan and thus invalid; a permanent injunction preventing the County from acting upon the permit or implementing it; and an injunction requiring the County to rescind the permit.
Now we must digress just a bit to note that in November 2001, the Alliance applied for its building permit, and its building plans were approved on December 3, 2001, contingent upon issuance of a septic permit. The septic permit was obtained, and the building permit was actually issued on April 12, 2002. The significance of these dates becomes apparent when we consider that at the time application for the building permit was made by the Alliance on November 19, 2001, the camp property was within an area designated for "Agricultural II" land use on the Comprehensive Plan's Future Land Use Map. On December 11, 2001, the Board adopted an ordinance that amended the Future Land Use Map by changing the land use designation of a large segment of land, including the camp property, to the classification of "Rural Residential." The import of this change is dramatic because camps were a permitted land use under the Agricultural II designation, but are not a permitted land use under the Rural Residential designation.
Acceding to the argument advanced by the Alliance, the trial court ruled that the operative event is application for the permit as opposed to issuance of the permit and, therefore, the Agricultural II designation controls because that was the land use designation at the time application was made on November 1, 2001. Significantly, however, the trial court noted that "[u]nder the current designation of rural residential, the Court accepts that no further construction of dormitories would be permitted without running afoul of Section 163.3215." Advocating for the notation rather than the ruling, the Coalition contends that issuance of the permit, which was well after the change in the land use designation, controls because it is government action that triggers application of the provisions of section 163.3215. Hence, the general issue, previously stated, that we must resolve is whether the trial court properly applied the Agricultural II classification under the Comprehensive Plan when determining whether the building permit applied for by the Alliance should have been issued. The answer lies in various statutory provisions, which we next examine.
We look first to section 163.3215, which governs when an action for injunctive or other relief may be taken against a local government to prevent action on a development order. This statute provides in pertinent part:
Any aggrieved or adversely affected party may maintain an action for injunctive or other relief against any local government to prevent such local government from taking any action on a development order, as defined in s. 163.3164, which materially alters the use or density or intensity of use on a particular piece of property that is not consistent with the comprehensive plan adopted under this part.
§ 163.3215(1), Fla. Stat. (2001). Next, our analysis of the pertinent provisions of section 163.3164, Florida Statutes (2001), reveals that a building permit is a "development order." Finally, section 163.3194(1)(a), Florida Statutes (2001), requires that once a comprehensive plan has been adopted, "all development undertaken *209 by, and all actions taken in regard to development orders by, governmental agencies in regard to land covered by such plan or element shall be consistent with such plan or element as adopted."
These statutory provisions reveal that the Coalition is correct: It is government action on a development order rather than application for such an order that triggers application of section 163.3215(1). Moreover, compliance with a comprehensive plan by government agencies regarding issuance of development orders, such as building permits, is mandatory.
We conclude that the government action was taken on April 12, 2002, when the County issued the building permit. By this date, the Comprehensive Plan had already been amended to change the land use classification of the camp property from Agriculture II to Rural Residential, in which a camp is not permitted. We believe that no earlier date can be assigned to the government action because section 163.3215(4), Florida Statutes (2001), requires that a verified complaint be filed with the governing body within 30 days of issuance of the challenged development order and the challenged development order in this case, the building permit, issued April 12, 2002. As of that date, the amendment to the Future Land Use Map changing the classification of the camp property from Agricultural II to Rural Residential had already taken place. Accordingly, the court erred in concluding that the Agricultural II use controlled and upholding the County's grant of the permit, which had the effect of allowing expansion of an inconsistent use contrary to the Comprehensive Plan.
The decision in Gardens Country Club, Inc. v. Palm Beach County, 590 So.2d 488 (Fla. 4th DCA 1992), touted by the County in support of its position that the comprehensive plan in existence at the time the permit application is made governs resolution of the issue before us, gives us no reason to wonder, even for the briefest moment, whether our conclusion is wrong. The essence of the holding in Gardens is that the comprehensive plan in effect when the PUD should have been issued was the applicable plan because, as admitted by the county in that case, the PUD application was in full compliance with the then-current comprehensive plan but was improperly stonewalled by the government until the revision to the plan could be adopted. Here there is no allegation that the County deliberately did anything to stonewall or sabotage issuance of the building permit until after the Comprehensive Plan was amended. Clearly, then, Gardens is distinguishable from the instant case, and we refuse to extend the reach of that decision beyond its proper bounds.
The Alliance alternatively argues that if the amended plan determines the outcome, the Coalition failed to establish that the new development would cause a material alteration of the land use inconsistent with the amended plan. Therefore, the Alliance urges that issuance of the permit was proper. We disagree. Adverting to the provisions of section 163.3215(1), a challenge to a development may arise under any one of the following three instances: 1) where it materially alters the use of a property; 2) where it materially alters the density of property; or 3) where the intensity of the use of the property is materially altered. We believe that the Coalition's challenge to the building permit establishes that the permit was improperly issued for all three reasons.
As to the first reason, our analysis is based on the premise, already established, that the amended Comprehensive Plan, which classifies the camp property as Rural Residential, governs issuance of the *210 building permit to the Alliance. Under the Comprehensive Plan, the County is required to eliminate or reduce land uses that are inconsistent with the Future Land Use Map designation. This is accomplished under the Comprehensive Plan's directive that "nonconforming land uses" be brought into conformance, albeit perhaps gradually, by acting on applications for building permits in a manner that will bring the land use into conformance with the Future Land Use Map designations. We believe that the County acted inconsistently with the objectives of the Comprehensive Plan by granting the building permit to the Alliance because the permit allows improvements and additions to the nonconforming use of camp property in clear violation of the Comprehensive Plan's designation of the property as Rural Residential. For this reason alone, issuance of the building permit was improper. Nevertheless, we will briefly explain why issuance of the permit was improper for the second and third reasons under section 163.3215(1).
The evidence reveals that the additional housing provided by the new dormitory would increase the population density of the camp by 28% and increase the intensity of the use of the structures at the camp. We note that section 163.3177(6)(a), Florida Statutes (2001), requires every comprehensive plan to contain "standards to be followed in the control and distribution of population densities, and building and structure intensities," with each land use category being defined "in terms of the types of uses included, and specific standards for the density or intensity of use." Density is distinguished from intensity because the former relates to population while the latter relates to structures. See Florida Wildlife Fed'n v. Collier County, 819 So.2d 200 (Fla. 1st DCA 2002); see also § 163.3221(4)(a)2., Fla. Stat. (2001) (referencing "[a] change in the intensity of use of land, such as an increase in the number of dwelling units in a structure or on land. . . ."). Thus, a development order that permits an increase in the number or size of structures on land is an alteration of the intensity of the use of the land, and a development order that permits an increase in population is an alteration of density. Here, both density and intensity were materially affected by issuance of the building permit to the Alliance.
We are not much impressed with the Alliance's arguments that it had a vested right to have the permit issued under the Agricultural II designation of the Comprehensive Plan prior to its amendment and that the Coalition lacked standing to pursue the consistency challenge under section 163.3215. We are equally unimpressed with the arguments advanced by the Alliance in support of the issues it raises in its cross appealthat the trial court erred in refusing to find the section 163.3215 action barred by the Coalition's alleged failure to exhaust its administrative remedies applicable to the zoning challenges; that the trial court erred in ruling that the Coalition was not bound by application of administrative res judicata from re-arguing issues of fact and law previously litigated; and that the trial court erred in ruling that the findings made by the trial court in a companion certiorari case are res judicata and should be applied to bar the instant action. As to those issues, we affirm the trial court's ruling without further comment.
Having concluded that issuance of the building permit to the Alliance was improper, a determination must be made regarding the appropriate remedy for the noncompliance. We note that the new dormitory has already been built and that the Coalition advised us at oral argument that it was not seeking demolition of the new structure. What then is the proper *211 remedy? We expect the answer to that question to come from the trial court upon remand and after further proceedings consistent with this opinion.
AFFIRMED in part; REVERSED in part; and REMANDED.
SHARP, W., and GRIFFIN, JJ., concur.